**ALDRICH LAW FIRM, LTD.**
JOHN P. ALDRICH
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
Telephone: (702) 853-5490
Facsimile: (702) 227-1975


THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
DAVID M. PROMISLOFF
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DANNY HINSON, Derivatively on Behalf of WYNN RESORTS, LIMITED, | Case No. |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL AND UNJUST ENRICHMENT |
| vs. | |
| STEPHEN A. WYNN, MARC D. SCHORR, MATT MADDOX, LINDA CHEN, KIM SINATRA, RUSSELL GOLDSMITH, RAY R. IRANI, ROBERT J. MILLER, JOHN A. MORAN, ALVIN V. SHOEMAKER, D. BOONE WAYSON, ELAINE P. WYNN and ALLAN ZEMAN, | |
| Defendants, | |
| – and – | |
| WYNN RESORTS, LIMITED, | |
| Nominal Party. | |

DEMAND FOR JURY TRIAL

- 1 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.       Plaintiff Danny Hinson ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Wynn Resorts, Limited ("Wynn" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment during the Relevant Period.

2.       According to its public filings, Wynn owns and operates Wynn Las Vegas, Encore and Wynn Macau.  Wynn Las Vegas is a luxury hotel and destination casino resort located on the Las Vegas Strip.  Encore, an expansion of Wynn Las Vegas located immediately adjacent to Wynn Las Vegas, opened on December 22, 2008. Wynn Macau is a destination casino resort in the Macau Special Administrative Region of the People's Republic of China.  Encore at Wynn Macau, an expansion of the original Wynn Macau, opened on April 21, 2010.

3.       Aruze USA, Inc. ("Aruze USA") is the U.S. subsidiary of Tokyo-based Aruze Corp., which in turn is a subsidiary of Universal Entertainment Corporation ("Universal Entertainment"), a company that is majority-owned by Kazuo Okada ("Okada") and his family.  Okada is a co-founder of Wynn and for years had been the Company's largest shareholder.  Until recently, Wynn founder, Chief Executive Officer ("CEO") and Chairman of the Board Stephen A. Wynn ("S. Wynn") and Okada were close friends, with S. Wynn going as far to state, "I love Kazuo Okada as much as any man I have met in my life.  He's my partner and my friend."  This partnership and friendship would go down in flames in 2011.

4.       Recently, the Company has been thrust in the middle of a personal-turned-legal battle between S. Wynn and Okada, which has led to a forced buyout of Okada's Wynn shares.  The fight surrounds, among other things, Okada's casino interests in the Philippines, and a $135 million

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

"donation" made by S. Wynn to the University of Macau.

5.     As a result, Okada and the Individual Defendants (defined herein) have sued each other in Nevada court.  Specifically, the Individual Defendants caused the Company to file suit against Okada, Aruze USA and Universal Entertainment in the court of Clark County, Nevada.[1] Okada, Aruze USA and Universal Entertainment filed their counterclaim and answer in United States District Court, District of Nevada.[2] This litigation brought to the surface the underlying issues S. Wynn and the Individual Defendants had with, among other things, Okada building a casino in the Philippines.  In fact, and initially unbeknownst to Wynn investors, the Individual Defendants hired former FBI director Louis Freeh ("Freeh") to conduct an "investigation" of Okada.  Further, the Individual Defendants caused Okada to be stripped of his Vice Chairman of the Board position in November 2011.  The Individual Defendants caused this material information to be concealed from the public until much later.[3]

6.     Beginning in October 2011 and continuing through December, Okada made a series of demands on the Board to investigate the business records related to the allegations against him and the University of Macau "donation."  The Individual Defendants denied each and every one of these demands in an effort to stonewall Okada's investigation of the allegations against him and the actions of the Individual Defendants themselves.  On January 11, 2012, Okada filed an action in Nevada state court seeking the production of Wynn's business records.

7.     In February 2012, the Board voted to redeem Aruze USA's stock in Wynn at a 30%

---

[1] *See Wynn Resorts, Limited v. Kazuo Okada et al.,* No. A-12-656710-B (Clark County, Nevada, February, 19, 2012).

[2] *See Wynn Resorts, Limited v. Kazuo Okada et al.,*No. 2:12cv00400 (D. Nevada, March 12, 2012).

[3] A significant portion of the allegations contained herein appear in the *Wynn Resorts, Limited v. Kazuo Okada et al.* complaint and counterclaim.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1  discount (payable in 2022) and called a special meeting to remove Okada as a Company director.
2  Meanwhile, the Individual Defendants caused Okada to be removed as a director from various
3  Company subsidiaries.

4          8.      The Individual Defendants caused Wynn to file suit against Okada on February 18,
5  2012, and Okada filed a countersuit on March 12, 2012.  The Individual Defendants, in a
6  preliminary proxy statement filed with the SEC on Form PRE 14A on March 7, 2012 (the "Proxy"),
7  have indicated that they intend to hold a special meeting for the purposes of a shareholder vote to
8  remove Okada from the Board.  As of the filing of this Complaint, no date has been set for the
9
10 special meeting.

11         9.      The true facts, which were known by the Individual Defendants, but concealed from
12 the investing public during the Relevant Period, were as follows:

13         a.  That defendant S. Wynn, with the knowledge and consent of the Individual
14             Defendants, was using the Company's treasury to fund his personal fight with
15             Okada;
16
17         b.  That the Individual Defendants caused Okada to be stripped of his Vice Chair
18             position, and caused this material information to be concealed from investors;
19             and
20
21         c.  That the Individual Defendants caused or allowed S. Wynn to make a highly
22             suspicious donation to the University of Macau, which would cause the
23             Company to be investigated for potential violations of the Foreign Corrupt
24             Practices Act ("FCPA").

25         10.     As such, the Individual Defendants have caused the Company to be caught in the
26 middle of an expensive legal battle between S. Wynn and Okada, with the funding for this battle
27 coming from the Company itself.  Further, the Individual Defendants have caused the Company to
28
                                       - 4 -

suffer losses to its reputation as a result of accusations that have and will emerge at the trial. Moreover, the Individual Defendants have caused the Company to be liable for potential future costs associated with the ongoing litigation, and for potential costs and fines associated with an investigation and finding on the University of Macau "donation."

11.     Accordingly, as a result of the Individual Defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district.   One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

14.     Plaintiff is a current shareholder of Wynn and has been continuously since October 2008.  Plaintiff is a citizen of South Carolina.

15.     Nominal defendant Wynn is a Nevada corporation with its executive offices located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 89109.  According to its public filings,

- 5 -

Wynn owns and operates Wynn Las Vegas, Encore and Wynn Macau.  Wynn Las Vegas is a luxury hotel and destination casino resort located on the Las Vegas Strip.  Encore, an expansion of Wynn Las Vegas located immediately adjacent to Wynn Las Vegas, opened on December 22, 2008. Wynn Macau is a destination casino resort in the Macau Special Administrative Region of the People's Republic of China.  Encore at Wynn Macau, an expansion of the original Wynn Macau, opened on April 21, 2010.

16.     Defendant S. Wynn has served as the Company's CEO and Chairman of the Board and since June 2002.  Defendant S. Wynn also serves as the Chairman and Chief Executive Officer of Wynn Macau, Limited.  Upon information and belief, defendant S. Wynn is a citizen of Nevada.

17.     Defendant Marc D. Schorr ("Schorr") has served as the Company's Chief Operating Officer ("COO") since May 2002 and as a director since 2010.  Upon information and belief, defendant Schorr is a citizen of Nevada.

18.     Defendant Matt Maddox ("Maddox") has served as the Company's Chief Financial Officer ("CFO") and Treasurer since March 2008.  Upon information and belief, defendant Maddox is a citizen of Nevada.

19.     Defendant Linda Chen ("Chen") has served as a director of the Company since October 2007 and as the President of Wynn International Marketing, Limited, since January 2005.  In addition, defendant Chen has served as the COO of Wynn Resorts (Macau), S.A., since June 2002, and is a member of the Board of Directors of Wynn Macau, Limited.  Upon information and belief, defendant Chen is a citizen of Nevada.

20.     Defendant Kim Sinatra ("Sinatra") has served as the Company's General Counsel and Secretary since 2006, and as Senior Vice President and General Counsel of Worldwide Wynn, LLC since 2004.  Upon information and belief, defendant Sinatra is a citizen of Nevada.

21.     Defendant Russell Goldsmith ("Goldsmith") has served as a director of the Company

- 6 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

since May 2008.  In addition, defendant Goldsmith served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Goldsmith is a citizen of California.

22.     Defendant Ray R. Irani ("Irani") has served as a director of the Company since October 2007.  Upon information and belief, defendant Irani is a citizen of California.

23.     Defendant Robert J. Miller ("Miller") has served as a director of the Company since October 2002.  Upon information and belief, defendant Miller is a citizen of Nevada.

24.     Defendant John A. Moran ("Moran") has served as a director of the Company since October 2002.  Upon information and belief, defendant Moran is a citizen of Florida.

25.     Defendant Alvin V. Shoemaker ("Shoemaker") has served as a director of the Company since October 2002.  In addition, defendant Shoemaker served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Shoemaker is a citizen of Pennsylvania.

26.     Defendant D. Boone Wayson ("Wayson") has served as a director of the Company since August 2003.  In addition, defendant Wayson served as Chair of the Audit Committee during the Relevant Period. Upon information and belief, defendant Wayson is a citizen of Maryland.

27.     Defendant Elaine P. Wynn ("E. Wynn") has served as a director of the Company since October 2002. E. Wynn is the former wife of S. Wynn.  Upon information and belief, defendant E. Wynn is a citizen of Nevada.

28.     Defendant Allan Zeman ("Zeman") has served as a director of the Company since October 2002.  In addition, defendant Zeman served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Zeman is a citizen of Hong Kong, the People's Republic of China.

29.     Collectively, defendants S. Wynn, Schorr, Maddox, Chen, Sinatra, Goldsmith, Irani,

- 7 -

1  Miller, Moran, Shoemaker, Wayson, E. Wynn and Zeman shall be collectively referred to herein as

2  the "Individual Defendants."

3      30.    Defendants Goldsmith, Shoemaker, Wayson and Zeman are collectively referred to

4  as the "Audit Committee Defendants."

5  **THE INDIVIDUAL DEFENDANTS' DUTIES**

6      31.    By reason of their positions as officers, directors, and/or fiduciaries of Wynn and

7  because of their ability to control the business and corporate affairs of Wynn, the Individual

8  Defendants owed Wynn and its shareholders fiduciary obligations of good faith, loyalty, and

9

10  candor, and were and are required to use their utmost ability to control and manage Wynn in a fair,

11  just, honest, and equitable manner.  The Individual Defendants were and are required to act in

12  furtherance of the best interests of Wynn and its shareholders so as to benefit all shareholders

13  equally and not in furtherance of their personal interest or benefit.  Each director and officer of the

14  Company owes to Wynn and its shareholders the fiduciary duty to exercise good faith and diligence

15  in the administration of the affairs of the Company and in the use and preservation of its property

16  and assets, and the highest obligations of fair dealing.

17

18      32.    The Individual Defendants, because of their positions of control and authority as

19  directors and/or officers of Wynn, were able to and did, directly and/or indirectly, exercise control

20  over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and

21  directorial positions with Wynn, each of the Individual Defendants had knowledge of material non-

22  public information regarding the Company.

23      33.    To discharge their duties, the officers and directors of Wynn were required to

24  exercise reasonable and prudent supervision over the management, policies, practices and controls

25  of the Company.  By virtue of such duties, the officers and directors of Wynn were required to,

26

27  among other things:

28
- 8 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

34.  Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

a.  Review the Company's annual audited and quarterly financial statements;

b.  Review critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review prior to the filing of any annual or quarterly financial statements with the SEC;

c.  Review the effect of regulatory and accounting initiatives on the financial statements of the Company;

d.  Recommend to the Board whether to include the audited annual financial statements in the Company's annual report on Form 10-K to be filed with the SEC; and

e.  Review with management any significant deficiencies and material weaknesses in the design or operation of the Company's internal controls.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

## SUBSTANTIVE ALLEGATIONS

### Background

35.     According to its public filings, Wynn owns and operates Wynn Las Vegas, Encore and Wynn Macau.  Wynn Las Vegas is a luxury hotel and destination casino resort located on the Las Vegas Strip.  Encore, an expansion of Wynn Las Vegas located immediately adjacent to Wynn Las Vegas, opened on December 22, 2008. Wynn Macau is a destination casino resort in the Macau Special Administrative Region of the People's Republic of China.  Encore at Wynn Macau, an expansion of the original Wynn Macau, opened on April 21, 2010.

36.     Aruze USA is the U.S. subsidiary of Tokyo-based Aruze Corp., which in turn is a subsidiary of Universal Entertainment, which is majority-owned by Okada and his family.

### The Company is Born

37.     On November 30, 2000, Aruze USA invested $260 million in exchange for membership interests in Valvino Lamore, LLC ("Valvino Lamore"), the predecessor to Wynn Resorts.  Other members of Valvino Lamore included S. Wynn and Baron Asset Fund.  In April 2002, Aruze USA invested another $120 million in Valvino Lamore, of which $30 million would fund "due diligence" for the Wynn Macau project and the remaining $90 million would fund other aspects of the Wynn Macau project.  Upon information and belief, at no time prior to making the investment did S. Wynn or Valvino Lamore investigate whether there was a culture of corruption in Macau.

38.     On April 11, 2002, Aruze USA, S. Wynn and Baron Asset Fund entered into a Stockholders Agreement that restricted the transfers of shares—including involuntary transfers—of the to-be-formed Company.

39.     On June 3, 2002, S. Wynn filed Articles of Incorporation in the state of Nevada for Wynn that did not include any redemption provisions.  On June 11, 2002, Wynn, Aruze USA, S.

- 10 -

Wynn, Baron Asset Fund and the Kenneth R. Wynn Family Trust entered into a contribution agreement that transferred the Valvino Lamore membership interests in Valvino Lamore to Wynn. In exchange, each LLC member would receive Wynn shares after S. Wynn contributed the membership interests to Wynn.   S. Wynn was to contribute the interests and provide the shareholders their shares of stock "as soon as practicable."  This contribution agreement did not provide for redemption of the shareholders' Wynn stock, and also included an integration clause.

40.    As of September 16, 2002, S. Wynn had yet to transfer the Valvino Lamore membership interests to Wynn, and thus on that day, S. Wynn was Wynn's sole shareholder and director.  This left S. Wynn in effective control of all of the Company's corporate matters, as he had yet to deliver to the other Valvino Lamore members their shares in Wynn stock. This gave S. Wynn the ability to unilaterally alter the terms of Wynn's corporate structure, even after Wynn's initial shareholders had already pledged their consideration for Wynn stock.  S. Wynn capitalized on this opportunity by unilaterally amending the Company's Articles of Incorporation to include redemption provisions for "Unsuitable Persons."  This change altered the corporate structure of Wynn without referring the matter to a vote of the other Wynn shareholders—including Okada. Nearly ten years later, S. Wynn would use this "nuclear option" against Okada.

41.    On September 28, 2002, S. Wynn finally transferred the Valvino Lamore membership interests to Wynn.  Valvino Lamore became a wholly-owned subsidiary of the Company, and the new shareholders of Wynn controlled both entities.

42.    On October 25, 2002, Wynn launched its initial public offering ("IPO") on the NASDAQ, raising $350 million.  Shortly thereafter, Okada became Vice Chairman of the Board.

43.    Over the next few years, Aruze USA and S. Wynn would each control approximately twenty percent of Wynn Resorts following the dilution of their respective shares caused by, among other things, Wynn's IPO.

- 11 -

44.   On November 8, 2006, Aruze USA and S. Wynn amended the Stockholders
Agreement to prohibit the transfer of shares without the other party's consent.

### The Asian Markets Explode

45.   Beginning around 2007, Okada started to pursue casino opportunities in the Asian
markets.  Upon information and belief, Okada handed out his Wynn Resorts business cards while
making contacts in this endeavor.  At the time, the special administrative region of Macau in China
was becoming the premier market for gaming.  Wynn had a casino there--the Wynn Macau--and
Okada was a member of the Wynn Macau Board.  Gaming in Asia was an explosive market, and
Okada explored other business opportunities in the region.

46.   On May 1, 2008, during a quarterly earnings conference call, defendant S. Wynn was
expressly asked about whether he personally thought Okada's Philippines project would compete
with Wynn.  As defendant S. Wynn stated in the meeting:

> Q: A couple of days ago, your significant investor Aruze put out a press release that
> they were considering doing something in the Philippines, I guess about two and a
> half billion U.S. and your name was in the press release in kind of a strange way,
> The Wynn   Corporation.   Could you bring us up-to-date on what is or is not
> happening there?
>
> A (S. Wynn):  Well, first of all, I love Kazuo Okada as much as any man I have met
> in my life.  He's my partner and my friend.  And there is hardly anything I won't do
> for him.  Now, we are not at the present time an investor nor do we contemplate an
> investment in the Philippines.  This is something that Kazuo Okada and his company
> Aruze has done on its own initiative.  He consults me and has discussed it with me
> extensively.  And I've given him my own personal thoughts on the subject and
> advice.  And to the extent that he comes to me for any more advice or input, all of us
> here at the company would be glad to give him our opinion.  But that is short of
> saying that this is a Wynn Resorts project.  It is a Aruze project.  Is that helpful,
> Larry?
>
> Q: Yeah.  It's a large amount of money, and I'm wondering if he does it, will he be
> taking some of his pretty substantial profits in your company, do you think?  Have
> you discussed that?
>
> A (S. Wynn): If I can remind you, Larry, and other people that are listening, we filed
> an amended 13-D over a year and a half ago in December that expressed and

- 12 -

explained in detail the shareholder agreement between myself and Mr. Okada. We have what is commonly referred to as a lock-up. Neither one of us can sell any shares to anybody without the other's permission. That's in addition to a right of first refusal that we share and a vote for the board of directors that I hold on behalf of Mr. Okada. So we don't anticipate, and we have said so publicly, with a Hart-Scott-Rodino filing and with an amended 13-D that our stock is for sale at any price, but that we would purchase this company on weakness, on price weakness, up to 100%. So that's not a new public statement I'm making. We filed Hart-Scott-Rodino in '06. And I think that anybody who is short selling this company ought to keep that in mind. We'd love to see a buying opportunity in this stock. Love to see a buying opportunity in this stock.

47.     In August 2008, a subsidiary of Aruze USA secured a casino license in the Philippines. Okada attempted to bring defendant S. Wynn and the Company in on the project, but defendant S. Wynn declined the offer. However, S. Wynn did allow Okada's employees to photograph the Company's casinos for planning and development purposes.

48.     In early 2009, Okada sought financing for the Philippines project. Lenders sought to encumber Aruze USA's shares in Wynn as security for the loans, but the Wynn Stockholders Agreement prohibited such encumbrances. Okada asked S. Wynn on several occasions for permission to amend the Stockholders Agreement to use Aruze USA's Wynn shares as security, but instead, S. Wynn lent Okada $60 million as a personal loan. Defendants did not disclose the loan, and Okada repaid the loan within a year.

### Control of the Company is Altered

49.     In March 2009, S. Wynn divorced his wife, E. Wynn. As part of the marital settlement, S. Wynn transferred half of his shares in the Company to E. Wynn. At this point, S. Wynn controlled half as many shares as Aruze USA did, which meant that Okada was the largest Wynn shareholder.

50.     On January 6, 2010, Aruze USA and S. Wynn amended the Stockholders Agreement to include E. Wynn as a party to the agreement.

51.     As part of the agreement, S. Wynn would nominate the directors for the Company,

- 13 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

and Okada could nominate a minority slate of directors.  Also under the agreement, S. Wynn was bound to endorse Okada's minority slate, provided S. Wynn could still control a majority of the Board.

### Questions Emerge About Business Practices in Asia

52.     During April 2010, S. Wynn visited Okada's Philippines project.  It has been alleged that over time, S. Wynn became concerned that corrupt practices were prevalent in the Philippines and that Wynn could be implicated by such practices.  However, upon information and belief, S. Wynn did not have similar concerns of corruption in Macau.

53.     According to Wynn's financial statements, a finding that the Company was taking part in corrupt practices would essentially be a death-blow to the company.   As Defendants knew, the gaming industry is heavily regulated, and violations of the FCPA would jeopardize the Company's ability to hold its gaming licenses.  Holding a gaming license is critical and necessary for a gaming company, and information surrounding these allegations is material to Wynn's investors.

54.     In January 2011, Wynn's Compliance Committee (the "Compliance Committee"), a management committee of Wynn, commissioned a report on the Philippines project purportedly looking into the prevalence of corruption both in the project specifically and in the Philippines casino market generally.   The Compliance Committee was comprised of defendants Miller and Schorr, as well as Wynn Executive Vice President and Chief Administrative Officer John Strzemp.

55.     On February 24, 2011, the Board reviewed the Compliance Committee's report.  The report purportedly found that the Philippines had a "deeply ingrained" culture of corruption.  The Board ordered that Wynn not become involved in the project and that S. Wynn cancel a planned visit to meet with the Philippines president.

56.     In truth, the Philippines was far from the only Asian gaming market with a purported

- 14 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

"culture of corruption." On March 1, 2011, Las Vegas Sands Corp. ("Las Vegas Sands"), a peer of Wynn Resorts in both Las Vegas and Macau, disclosed in its annual report that it received a subpoena from the Justice Department regarding an FCPA investigation of Las Vegas Sands' Macau operations.

57.     Accordingly, the Individual Defendants knew that the Company's foreign operations, including its Macau operations, posed a risk for FCPA violations, and Las Vegas Sands' announcements increased that risk for Wynn.

**The University of Macau "Donation" and Share Transfers**

58.     Without a Compliance Committee review of Macau, in May 2011, S. Wynn, through Wynn Macau and with the blessing of the Individual Defendants, pledged a *$135 million* "donation" to the University of Macau. The "donation" consisted of a $25 million donation in May 2011 and annual $10 million donations from 2012 to 2022. Curiously, the Wynn Macau gaming commission expires in June 2022. Okada objected to this donation.

59.     On May 16, 2011, Okada and S. Wynn met to discuss Okada's consent to allow E. Wynn to transfer her Wynn shares. Okada agreed-in-principal to the transfer, but wished to sell or encumber the same amount of shares that E. Wynn would be transferring for his use in his Philippines project.

60.     Upon information and belief, S. Wynn was concerned that such a massive amount of share sales by both E. Wynn and Okada could impact Wynn's stock price, so instead S. Wynn promised to cause Wynn to loan funds to Okada in exchange for his consent to E. Wynn's stock transfer. Okada gave his consent to E. Wynn's transfer with this understanding.

61.     On June 9, 2011, defendant Sinatra informed Aruze USA's attorneys that she was "concerned" about the loan due to the Sarbanes-Oxley Act. Section 402 of this Act prohibits loans to a director or officer of a publicly-traded company.

- 15 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

62.     By this time, S. Wynn would claim to be increasingly concerned with Okada's activities in the Philippines.  On July 28, 2011, the supposed "independent directors" of the Board met and expressed continuing concern about corruption practices in the Philippines.  They commissioned a second report by the Compliance Committee and scheduled a training session for Board on the FCPA for October 31, 2011, a day before the Board's meeting.  Again, upon information and belief, no report was made regarding possible corruption in Macau.

63.     On August 5, 2011, the members of the Board received copies of the Company's compliance policies for review.  Okada was the only director not to acknowledge review of the policies.

64.     In the fall of 2011, the website for *Hotels Magazine* published an article describing Okada's Philippines project as a Wynn partnership.  The hotels also looked similar to Wynn's casinos in Las Vegas and Macau.  According to an article published in The Wall Street Journal on March 12, 2012, news of the *Hotels Magazine* article angered S. Wynn.

65.     On September 27, 2011, the Compliance Committee reviewed the second report of Okada's Philippines project.  This report implicated Okada as taking part in bribes relating to the project and was the first report to specifically implicate Okada.

66.     That same day, Frank Schreck ("Schreck"), an attorney for Wynn, abruptly resigned from Universal Entertainment's Compliance Committee.  The new chair for Universal Entertainment's Compliance Committee conducted an exit interview with Schreck, during which Schreck stated his resignation from his chairship was not due to Okada's suitability to own a gaming business.  Yet the Individual Defendants continued to amass their unsuitability allegations in an effort to oust Okada, despite Schreck's statement.

67.     On September 30, 2011, Wynn's attorneys approached Okada's attorneys with the allegations from the Compliance Committee's second report.  Wynn's attorneys suggested that

- 16 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

Okada step down as member of the Board and the board of Wynn Macau, and that he pledge his shares subject to the Stockholders Agreement. Wynn's attorneys further suggested that Okada place his shares in a voting trust that would allow S. Wynn to control the shares and have a right of first refusal to purchase the shares. Also on that day, the Compliance Committee formally refused to offer Okada the loan that S. Wynn had promised in May 2011.

68. Okada continued his efforts to refute the allegations against him. On October 3, 2011, Aruze USA's attorneys asked for a copy of the Compliance Committee report. The Individual Defendants caused Wynn to refuse to provide a copy to Aruze USA.

69. On October 4, 2011, S. Wynn and Okada met. During the meeting, S. Wynn accused Okada of the corruption outlined in the Compliance Committee report--that Okada and his businesses had stolen Wynn trade secrets and that Okada's businesses were competing with Wynn, purportedly in violation of Okada's fiduciary duties to Wynn. S. Wynn again asked Okada for his resignation from the Wynn and Wynn Macau boards. Okada again asked for a copy of the investigative report, but Wynn's attorneys stated that it was privileged material. Okada contended he should not have to respond to the request for his resignation until he had time to further consider it. S. Wynn agreed and ended the meeting.

70. Okada continued to investigate the allegations against him. On October 24, 2011, Okada made a demand pursuant to NRS 78.257 for Wynn's business records relating to the Compliance Committee's investigation. The Individual Defendants refused the demand.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

71. On or around October 29, 2011, the Individual Defendants caused Wynn to retain Freeh and his investigative firm, Freeh Group International Solutions, LLC, to investigate Okada and his business activities in the Philippines.

- 17 -

72.    On October 31, 2011, the Board received the FCPA training that the "independent directors" had called for in July 2011. Okada did not attend.

73.    Then, at a meeting on November 1, 2011, the Individual Defendants eliminated Okada's position as Vice Chairman of the Board and ratified the retention of Freeh. The Individual Defendants caused this material event to be concealed from the public over the following weeks.

74.    For example, the very next day, on November 2, 2011, the Individual Defendants caused Wynn to file a Form 8-K with the SEC, stating that the Board has declared a dividend. The Form 8-K failed to disclose Okada's ouster as Vice-Chairman and the material facts surrounding Okada's ouster.

75.    That same day, Okada made another demand pursuant to NRS 78.257 for business records regarding Wynn Macau's donation to the University of Macau, Wynn's use of the $30 million Okada contributed in April 2002, and the circumstances surrounding the January 6, 2010 amendment to the Stockholders Agreement. On November 3, 2011, the Individual Defendants caused Wynn to refuse Okada's demand.

76.    Subsequently, on November 9, 2011, the Individual Defendants caused Wynn to file a Form 10-Q with the SEC. This Form 10-Q, signed by defendant Maddox, completely failed to disclose Okada's ouster as Vice Chairman and the material facts (or any facts for that matter) surrounding his ouster.

77.    That same day, the Individual Defendants caused Wynn to inform Okada that the Company had no record of receiving the $30 million Okada contributed in April 2002. On November 17, 2011, Okada provided proof via a bank statement of his $30 million contribution, and again made a demand for inspection regarding Wynn's business records.

78.    On November 28, 2011, the Individual Defendants caused Wynn to acknowledge receipt of the full $120 million Okada contributed in April 2002, yet the Individual Defendants

- 18 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

caused Wynn to fail to provide an accounting of the use of such funds.  In response to this, on November 29, 2011, Okada made another demand for business records regarding the full $120 million he contributed.  The Individual Defendants caused Wynn to refuse this demand.

79.     On December 12, 2011, Okada made a demand pursuant to NRS 78.257 to inspect the business records of Wynn and its predecessor entities regarding activity from 2000 to 2002.  On December 15, 2011, the Individual Defendants caused Wynn to refuse this demand.

80.     At this point, it was clear that the Individual Defendants were stonewalling Okada's efforts to investigate both the allegations against him and the Individual Defendants' own actions. Accordingly, on January 11, 2012, Okada filed an action in Nevada state court ordering the production of business records.

81.     Then, on January 12, 2012, the Individual Defendants caused Wynn to send a questionnaire to all Board members with a copy of Wynn's Code of Business Conduct and Ethics, asking for acknowledgement of each Board member's review of the code.  Okada did not acknowledge review of the Code of Business Conduct and Ethics.

82.     On January 27, 2012, Schreck (who earlier chaired Universal Entertainment's Compliance Committee), of the law firm of Brownstein Hyatt Farber Schreck LLP, appeared as counsel for Wynn in the Nevada books and records action pursuant to NRS 78.257.

83.     During this same timeframe, Freeh's investigation into Okada's activities continued and was nearing its completion.  On February 15, 2012, Freeh interviewed Okada as part of his investigation.  At the interview, Freeh confronted Okada on the allegations of bribery.  Following the meeting, Okada requested that he be allowed to send Freeh additional material regarding the allegations raised during the interview.  Freeh responded that Okada would be able to provide such material, but that Freeh was on a very quick timeframe to complete his report.  Freeh suggested that instead of spending time to compile material, Okada should proffer additional topics by the end of

- 19 -

day on February 17, 2012, and that Okada would have the chance to respond to the report after Okada received a copy of it along with the other Wynn directors.

84.    On February 18, 2012, the Board met.  Yet instead of allowing Okada to provide materials in his defense as promised, Freeh presented his findings to the Board directly.  Okada again asked for a copy of the report, but S. Wynn refused to allow Okada to receive a copy of the report without signing a nondisclosure agreement.  Okada refused to sign the nondisclosure agreement, presuming that doing so would preclude its use in legal proceedings.

85.    During the meeting, Okada faced ongoing problems receiving a translation of the meeting into Japanese, and Okada could not understand Freeh's report to the Board.  The Board asked Okada to respond.  Okada stated he could not understand Freeh's presentation and would respond only after reviewing a copy of the report.  Without hearing Okada's response, the telephone line Okada was using to participate in the meeting was severed, and the Board voted to redeem Aruze USA's stock in Wynn at a 30% discount, payable in 2022.

86.    Further, the Board created an Executive Committee of the Board  (the "Executive Committee") (consisting of all Board members except for Okada), and called a special meeting of Wynn shareholders to remove Okada as a director of the company.[4]

87.    That same day, the Individual Defendants caused Wynn to send Aruze USA a notice that it was unsuitable to hold stock in Wynn, and a notice that Aruze USA's shares would be redeemed.  Also on that same day, the Individual Defendants caused Wynn to file an action in

---

[4] Under Nevada law, only an affirmative, two-thirds vote of shareholders can remove a director in office. *See* Nev. Rev. Stat. § 78.335(1).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1   Nevada state court seeking to confirm its actions to redeem Aruze USA's shares.[5]

2   88.   Likewise, on February 19, 2012, the Individual Defendants caused Okada to be

3   removed from the board of Wynn Las Vegas Capital Corp., a wholly owned subsidiary of Wynn.

4   That same day, the Individual Defendants caused Wynn to file suit against Okada in Nevada state

5   court.

6   89.   On February 19, 2012, the Individual Defendants caused Wynn to leak a copy of the

7   Freeh Report to *The Wall Street Journal*, despite S. Wynn's demands that Okada receive a copy of

8   the report only subject to a nondisclosure agreement.

9

10   90.   Then, on February 24, 2012, Wynn Macau removed Okada from its Board.

11   91.   On March 7, 2012, the Individual Defendants caused Wynn to file the Proxy for the

12   special meeting to remove Okada as a director of Wynn.  The Proxy stated that the Executive

13   Committee recommended that shareholders vote for the proposal to remove Okada as a director.  As

14   of the filing of this Complaint, no date has yet been set for the special meeting.

15   92.   On March 12, 2012, Okada filed his countersuit against the Individual Defendants.[6]

16

17   93.   The true facts, which were known by the Individual Defendants, but concealed from

18   the investing public during the Relevant Period, were as follows:

19   a:   That defendant S. Wynn, with the knowledge and consent of the Individual

20       Defendants, was using the Company's treasury to fund his personal fight with

21       Okada;

22

23

24   [5] See *Wynn Resorts, Limited v. Kazuo Okada et al.*, No. A-12-656710-B (Clark County, Nevada, February, 19, 2012).

25

26   [6] See *Wynn Resorts, Limited v. Kazuo Okada et al.*, No. 2:12cv00400 (D. Nevada, March 12, 2012).

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

b.   That the Individual Defendants caused Okada to be stripped of his Vice Chairman position, and caused this information to be concealed from investors; and

c.   That the Individual Defendants caused or allowed S. Wynn to make a highly suspicious donation to University of Macau, which would cause the Company to be investigated for potential violations of the FCPA.

94.   As such, the Individual Defendants have caused the Company to be caught in the middle of an expensive legal battle between S. Wynn and Okada, with the funding for this battle coming from the Company itself.  Further, the Individual Defendants have caused the Company to suffer loss to its reputation as a result of accusations that will emerge at the trial.  Moreover, the Individual Defendants have caused the Company to be potentially liable for future costs associated with the ongoing litigation, and for potential costs and fines associated with an investigation and finding on the University of Macau donation.

95.   Accordingly, as a result of the Individual Defendants' breaches, the Company has been damaged

**DERIVATIVE AND DEMAND ALLEGATIONS**

96.   Plaintiff brings this action derivatively in the right and for the benefit of Wynn to redress the breaches of fiduciary duty and other violations of law by Defendants.

97.   Plaintiff will adequately and fairly represent the interests of Wynn and its shareholders in enforcing and prosecuting its rights.

98.   The Board currently consists of the following twelve (12) directors: defendants S. Wynn, Chen, Goldsmith, Irani, Miller, Moran, Schorr, Shoemaker, Wayson, E. Wynn, Zeman, and non-defendant Okada.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

- 22 -

a.  During the Relevant Period, defendants Goldsmith, Shoemaker, Wayson and Zeman served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. Defendants Goldsmith, Shoemaker, Wayson and Zeman breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.  In particular, as set forth above,, defendants Goldsmith, Shoemaker, Wayson and Zeman caused the Company to fail to report in the Company's SEC filings that Okada was removed Vice Chairman of the Board, which is a material event that is required to be disclosed. Therefore, defendants Goldsmith, Shoemaker, Wayson and Zeman each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

b.  The principal professional occupation of defendant S. Wynn is his employment with Wynn as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed with the SEC on Form DEF 14A on April 7, 2011, the Individual Defendants have admitted that defendant S. Wynn is not independent.  Thus, defendant S. Wynn admittedly lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

c.  The principal professional occupations of defendant Chen are her employment with Wynn as the President of Wynn International Marketing, Limited, and COO of Wynn Resorts (Macau), S.A., pursuant to which she has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed the SEC on Form DEF 14A on April 7, 2011, the Individual Defendants have admitted that defendant Chen is not independent.  Thus, defendant Chen admittedly lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

d.  The principal professional occupation of defendant Schorr is his employment with Wynn as its COO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed the SEC on Form DEF 14A on April 7, 2011, the Individual Defendants have admitted that defendant Schorr is not independent.  Thus, defendant Schorr lacks admittedly independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

e.   Due to their close personal relationship with each other defendants E. Wynn and S. Wynn are incapable of independently considering a demand against each other. In particular, E. Wynn is the former wife of S. Wynn, and has therefore had a substantial personal relationship with S. Wynn. In addition, according to the Company's Proxy Statement filed the SEC on Form DEF 14A on April 7, 2011, the Individual Defendants have admitted that defendant E. Wynn is not independent. Thus, defendant E. Wynn admittedly lacks independence from demonstrably interested directors, rendering her incapable of impartially considering a demand to commence and vigorously prosecute this action;

f.   Defendants S. Wynn, Chen, Goldsmith, Irani, Miller, Moran, Schorr, Shoemaker, Wayson, E. Wynn and Zeman each caused or were responsible for the elimination of Okada as Vice Chairman of the Board on or about November 1, 2011, and each willfully and purposely caused this material event to be omitted from the Company's SEC filings and public statements. Therefore, defendants S. Wynn, Chen, Goldsmith, Irani, Miller, Moran, Schorr, Shoemaker, Wayson, E. Wynn and Zeman each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

g.   Demand ion the entire Board is also futile because no reasonable stockholder would reasonably believe that the Board would be able to independently consider a demand in good faith. In particular, the Board denied (both summarily and by silence) Okada's demand to examine the books and records pursuant to NRS 78.257 in October 2011, November 2011 and December 2011. The Board has refused to release its books and records to the Company's largest shareholder whom was being sued by Wynn. Therefore, no reasonable stockholder would reasonably believe that this same Board that refuted the Company's largest shareholder would then be able to independently consider a demand in good faith based on the same or substantially similar allegations.

## FIRST CAUSE OF ACTION

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

99.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.   As alleged in detail herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Wynn disseminated accurate, truthful and complete information to its shareholders.

101.   The Individual Defendants violated their fiduciary duties of care, loyalty, and good

- 24 -

faith by causing or allowing the Company to disseminate to Wynn shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

102.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## SECOND CAUSE OF ACTION

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

103.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

104.    As alleged herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

105.    The Individual Defendants willfully ignored the obvious and pervasive problems with Wynn's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

106.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## THIRD CAUSE OF ACTION

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

107. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108. The Individual Defendants owed and owe Wynn fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Wynn the highest obligation of good faith, fair dealing, loyalty and due care.

109. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

110. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Wynn has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

111. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

112. Plaintiff, on behalf of Wynn, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT**

113. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Wynn.

115. Plaintiff, as a shareholder and representative of Wynn, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**FIFTH CAUSE OF ACTION**

- 26 -

**AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL**

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Wynn, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing Wynn to misrepresent material facts regarding its financial position and business prospects.

118.    As a direct and proximate result of the Individual Defendants' abuse of control, Wynn has sustained significant damages.

119.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

120.    Plaintiff, on behalf of Wynn, has no adequate remedy at law.

**SIXTH CAUSE OF ACTION**

**AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT**

121.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.    The Individual Defendants had a duty to Wynn and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Wynn.

123.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Wynn in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties

- 27 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

of due care, diligence and candor in the management and administration of Wynn's affairs and in the use and preservation of Wynn's assets.

124.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Wynn to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Wynn, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged Wynn.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing Wynn to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to Wynn restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

- 28 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

1    D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable

2  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

3    E.    Granting such other and further relief as the Court deems just and proper.

4                          **JURY DEMAND**

5    Plaintiff demands a trial by jury.

6

7  DATED:  April 4, 2012

8                                        **ALDRICH LAW FIRM, LTD.**

9                                        *John P. Aldrich*
                                         JOHN P. ALDRICH

10                                       1601 S. Rainbow Blvd., Suite 160
                                         Las Vegas, Nevada 89146

11                                       Telephone: (702) 853-5490
                                         Facsimile: (702) 227-1975

12

13                                       THE WEISER LAW FIRM, P.C.
                                         ROBERT B. WEISER

14                                       BRETT D. STECKER
                                         JEFFREY J. CIARLANTO

15                                       DAVID M. PROMISLOFF
                                         22 Cassatt Avenue, First Floor

16                                       Berwyn, PA 19312
                                         Telephone: (610) 225-2677

17                                       Facsimile:  (610) 408-8062

18                                       HUTTON LAW GROUP
                                         ANDREW W. HUTTON

19                                       AUSTIN J. EVANS
                                         12671 High Bluff Dr. Suite 130

20                                       San Diego, CA 92130
                                         Telephone: (858)793-3500

21                                       Fax: (858)793-3501

22                                       LAW OFFICE OF ALFRED G. YATES, JR., P.C.
                                         ALFRED G. YATES, JR.

23                                       GERALD L. RUTLEDGE
                                         519 Allegheny Building

24                                       429 Forbes Avenue
                                         Pittsburgh, PA 15219

25                                       Telephone: (412) 391-5164
                                         Fax: (412) 471-1033

26                                       Counsel for Plaintiff

27

28                                       - 29 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT

VERIFICATION

I, DANNY L. HINSON, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 4-4-2012

DANNY L. HINSON